

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

JUN 27 2007        4:30

Stephan Harris, Clerk
Casper

# United States District Court
──────────────── For The District of Wyoming ────────────────

SAVE OUR SNOWPLANES,              )
                                  )
    Plaintiff(s),             )
                                  )
vs.                               )        Case No. 05-CV-100-D
                                  )
GALE NORTON, et al.,              )
                                  )
    Defendant(s).             )

## ORDER UPHOLDING AGENCY ACTION

This matter comes before the Court on the Plaintiff's Petition for Review of Agency Action. The Court, having carefully considered the briefs and materials submitted in support of the Petition for Review and the Defendants' response thereto, having heard oral argument of counsel and being otherwise fully advised, FINDS and ORDERS as follows:

### BACKGROUND

The Plaintiff is an unincorporated group of individuals residing in the States of Wyoming and Idaho, who have historically made use of the winter fishing opportunity on the frozen surface of Jackson Lake, situated within the Grand Teton National Park. For many years, the Plaintiff's members have traveled across the frozen surface of Jackson Lake on individually-owned "snowplanes." Snowplanes are self-propelled

vehicles intended for over-snow travel and driven by a pusher propeller.  Presently,

snowplanes are not commercially manufactured to any significant extent, most being

individually built by enthusiasts out of available materials and/or salvaged parts.  There

is no standard design for snowplanes, other than that they are mounted on skis and use

an airplane propeller for propulsion. The snowplanes that were used in the past on

Jackson Lake varied widely in their design, form and appearance.  Snowplanes do not

have wings and are incapable of flight.  Because it is not possible to operate

snowplanes efficiently or safely at much less than 86 decibels, snowplanes produce

significantly more noise than any other type of over-snow vehicle authorized for use in

the national parks.

The first use of snowplanes on Jackson Lake may have occurred as early as

1935, prior to the establishment of the present day Grand Teton National Park (GTNP).

During the 1940s and to some extent the 1950s, snowplanes provided a means for

administrative access and some recreational use in the isolated interiors of Yellowstone

and Jackson Hole National Monument (established as Grand Teton in 1950).  During

this era, and in subsequent years, the use of over-snow vehicles to access Yellowstone

and GTNP was an emerging use for which no clear management guidance was

provided.  Over time, the use of snowmobiles and snowcoaches came to be the

predominant and popular method for visiting the interior of Yellowstone in winter, while

the use of snowplanes evolved into a relatively limited "niche" use for recreational users

seeking access to the frozen surface of Jackson Lake for ice fishing.  Up until the time

snowplanes were prohibited following the winter season of 2001-02, Jackson Lake was

one of the few areas in the country where snowplanes were used.

Beginning in 1961 and continuing until snowplane use was prohibited following

the winter season of 2001-02, the use of snowplanes in GTNP was managed through a

permit system, pursuant to federal regulations.  In the late 1960s, park management

became concerned about increased noise due to increased over-snow vehicle use.

New snowmobile noise regulations were promulgated in August 1971 and adopted as

part of Grand Teton's special regulations.  The regulation limited noise levels for both

snowmobiles and snowplanes to 86 decibels, but exempted snowplanes that had been

in use on Jackson Lake and registered with the park during the 1970-71 winter season.

In 1983, the National Park Service (NPS) once again promulgated and adopted

an amendment to the special regulations governing over-snow vehicle use in Grand

Teton.  The 1983 Rule differentiated between snowmobiles and snowplanes and

established a maximum noise level of 78 decibels for snowmobiles, consistent with

industry standards which provided that all snowmobiles manufactured after 1974 would

not exceed that level.  However, as stated in the 1983 Rule, "the combination of

propeller and manifold noise cannot be reduced significantly below 86 decibels without

seriously reducing the safety and maneuverability of snowplanes."  Therefore, different

noise levels were established for snowmobiles and snowplanes.  The 1983 Rule

allowed snowplanes to operate at the 86 decibel level, again with a "grandfather clause" that exempted snowplanes that were registered with GTNP for the 1970-1971 winter season.

In 1997, the Fund for Animals, an environmental advocacy group, challenged NPS's existing winter use programs for Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway (collectively, "the Parks") alleging, *inter alia*, noncompliance with the National Environmental Protection Act (NEPA). That lawsuit culminated in a settlement pursuant to which NPS agreed to prepare an environmental impact statement (EIS) and a record of decision (ROD) for new winter use plans for the Parks.

Public scoping comments on the winter use plans were accepted from April 14, 1998, to July 18, 1998. (*A.R.* 90007.) Scoping brochures were mailed to about 6,000 interested parties, and 12 public meetings were held throughout the Greater Yellowstone Area in Idaho, Montana, and Wyoming. *Id.* Approximately 2,000 comment letters were received. *Id.* NPS published a Draft EIS (DEIS) on September 29, 1999, and public comment was taken through December 15, 1999. (*A.R.* 90008; 64 FED. REG. 52520 (Sept. 29, 1999)). The DEIS included 7 alternatives, five of which retained the use of snowplanes on Jackson Lake, and two of which eliminated their use. (*A.R.* 19169-19225.) Though 46,500 comment letters were received on the DEIS, Plaintiff failed to submit a single comment. Purportedly based on the lack of support for the

-4-

preferred alternative, which phased-out snowmobile use but permitted snowplane use to continue, NPS began formulating a new preferred alternative. (*A.R.* 25437, 90088.)

In October 2000, the NPS published the Final EIS (FEIS) for new winter use plans. Although not required under NEPA and its implementing regulations,[1] NPS allowed public comments on the FEIS for 21 days, which gave interested persons an opportunity to comment on the change in the preferred alternative in the FEIS relative to the DEIS. Publication of the NPS's notice of availability was inadvertently delayed until October 31, 2000, the deadline for submitting comments on the FEIS. However, the FEIS was published and available to the public in hard-copy and on the internet on October 10, 2000. (*A.R.* 30360.) Moreover, NPS issued its press release, mailed out 46,500 summaries and about 400 copies of the FEIS to interested parties at that time. *Id.* The Environmental Protection Agency (EPA) issued its own notice of availability of the FEIS on October 20, 2000. (*A.R.* 12135.) Almost 11,000 comments were received during the public comment period on the FEIS. (*A.R.* 30360.) Plaintiff again failed to submit any comments.

Both the draft and the final versions of the EIS included alternatives that retained the use of snowplanes on Jackson Lake, as well as alternatives that eliminated their use. The analysis in the FEIS showed that at levels of use present in 2000, the combined use of snowplanes and snowmobiles on Jackson Lake was the largest

---

[1] 40 C.F.R. § 1503.1(b).

-5-

contributor to the overall amount of over-snow vehicle noise in the three park areas.[2]
(A.R. 90287, 90289-90290.) The FEIS analysis also showed that even when only
snowplanes restricted to 86 decibels were considered, the noise impacts were still
extremely high, despite their far smaller numbers compared to snowmobiles elsewhere
in the analysis. Although limited to Jackson Lake, the use of snowplanes were found to
have a dominant and unmitigated impact on the natural soundscape, contributing to a
disproportionately high percentage of the total area of the Parks that was impacted in
winter by the sounds of motorized over-snow vehicle use.

On November 22, 2000, the NPS issued a Record of Decision for the winter use
plans in the Parks ("2000 ROD"). The 2000 ROD selected an alternative which
eliminated recreational snowmobile and snowplane use from the Parks by the winter of
2003-04, and provided access to Yellowstone via a NPS-managed, mass transit
snowcoach system. (A.R. 91410.) In the 2000 ROD, the NPS found that "[t]he use of
snowmobiles and snowplanes at present levels harms the integrity of the resources and
values of these three parks, and so constitutes an impairment of the resources and
values, which is not permissible under the NPS Organic Act." (A.R. 91427.) The NPS
found that, in Grand Teton, "the impairment is the result of the impacts from
snowmobile and snowplane use on the natural sound scape and opportunities for

_____

[2] The use consisted of approximately twenty snowplanes per weekday and thirty
snowplanes per day on weekends, as well as approximately 30 snowmobiles.

enjoyment of the park by visitors." *Id.* The 2000 ROD further found "that the snowplane use occurring in GTNP is inconsistent with Executive Orders 11644 and 11989 and NPS management objectives for the parks." *Id.* On December 18, 2000, NPS published a proposed rule that would implement the 2000 ROD and provided 30 days for comments. 65 FED. REG. 79,024. NPS received 5,273 comments throughout the comment period. 66 FED. REG. 7,260 (January 22, 2001). Plaintiff failed to submit any comments. A final rule implementing the 2000 ROD was published on January 22, 2001 ("2001 Rule"), and prohibited the use of snowplanes after the end of the 2001-02 winter season. *Id.*

In December 2000, the International Snowmobile Manufacturer's Association ("ISMA") and other plaintiffs filed suit against NPS in the District of Wyoming alleging, among other things, that the 2000 ROD failed to consider new snowmobile technology and to adequately consider public comments on snowmobile use. Subsequently, the State of Wyoming moved to intervene. Neither ISMA nor the State of Wyoming challenged NPS's finding that snowplane use impaired park resources. In June 2001, the parties reached a settlement under which the lawsuit was stayed, and NPS agreed to prepare a supplemental EIS (SEIS) to consider "any significant new or additional information or data submitted with respect to a winter use plan," *particularly* "new information and data submitted regarding new snowmobile technologies," provide for increased public participation, and promulgate a new rule by November 15, 2002 ("the

-7-

2001 Settlement Agreement"). (*A.R.* 77629-776230). The NPS determined that "preparing a supplemental EIS regarding winter use in the Three Parks and considering new information and circumstances will further the purposes of NEPA." *Id.* at 77629. The parties further agreed, "Preparing a supplemental EIS will provide the affected public and cooperating agencies the opportunity to provide new information related to the impacts of winter use in the Parks and additional opportunity to provide comments on the winter use management of the Parks." *Id.*

Despite these general statements, the NPS limited the scope of analysis for the SEIS to consideration of new snowmobile technology, taking the position that the 2001 Settlement Agreement did not require it to reconsider its findings that snowplane use impaired park resources or otherwise address its decision to prohibit snowplane use.[3] Nevertheless, the initial draft SEIS stated, "Additional information from [ISMA] will be considered, as well as any other new or updated information not available at the time of the earlier decision." (*A.R.* 73589 at Page 3, Purpose of the Supplemental EIS (SEIS).) On October 1, 2001, an incomplete first draft of the SEIS was provided to the cooperating agencies. In response, several counties, including Teton County, Wyoming, questioned the NPS's previous decision to eliminate snowplanes from

---

[3] Therefore, the provisions prohibiting the use of snowplanes in GTNP after the 2001-2002 winter season took effect as they appeared in the existing regulations.

Jackson Lake.[4] (*A.R.* 73605, 73614.) The counties' comments did not, however, suggest the existence of new or updated information with respect to snowplane use. Rather, the agencies simply urged that this historic use be allowed to continue in GTNP.

In early January, 2002, the second draft of the SEIS was provided to the cooperating agencies. (*A.R.* 73854-73855.) In revising the stated purpose of the SEIS, the NPS added, "The SEIS focuses on three alternatives to the existing decision, seeking a means of allowing snowmobiles into the parks or deferring implementation of the existing decision." (*A.R.* 73854 at iv.) Again, in response, certain counties challenged the NPS's justification for the decision to eliminate snowplane use in GTNP. Park County, Montana, specifically questioned the existence of any sound or air emissions data justifying the elimination of snowplane use. The State of Wyoming Department of State Parks requested that Alternative 3 (Alternative 2 in previous draft) allow snowplane access on the frozen surface of Jackson Lake, capped at the existing

---

[4] Plaintiff also cites to the comments submitted from the cooperating agencies of the State of Wyoming on this point. However, the Court could not locate any reference to the NPS's previous findings with regard to snowplanes in the comments submitted by these State of Wyoming agencies. (*A.R.* 73618-73656.) At best, the specific comments submitted by the Wyoming Game and Fish Department simply indicate its desire for Jackson Lake to remain as an ungroomed motorized area during the winter, continuing to be jointly managed by the Bureau of Reclamation, the NPS, and the Game and Fish Department to coordinate the water, land, and fish use of the lake. (*A.R.* 73644-45.) The Game and Fish requested that all three Alternatives include language allowing for *snowmobile* access on the frozen surface of Jackson Lake for fishing access only. (*A.R.* 73645; Draft SEIS dated 10/01/01 at 21.)

number of permits, with provisions for a re-assessment of snowplane use. The Wyoming Game & Fish Department reiterated its position that continuation of motorized access to Jackson Lake should be a part of all NPS alternatives, without specific reference to snowplanes. (A.R. 73988-74030.)

According to the NPS, the elimination of motorized access to the frozen surface of Jackson Lake, and more specifically the ban on snowplanes, occurred by virtue of the previous decision, and the rationale therein, which was not being reevaluated in the SEIS. (A.R. 74194; see also A.R. 74188, 74151.) In response to the Game & Fish, the NPS's position was that the decision to close the lake surface to winter motorized use does not, at the same time, close the lake to fishing. The NPS preferred to encourage non-motorized access for this purpose. (A.R. 74162-63.) The Draft SEIS was made available for public comment on March 29, 2002.

On that same date, the NPS issued a Proposed Delay Rule to postpone the implementation of existing snowmobile regulations in the Parks for one year. (A.R. 81623-27.) The NPS indicated that additional time was needed to plan for and implement the NPS-managed, snowcoach-only system in the existing Winter Use Plan and to complete the SEIS. The proposed rule stated, "The existing regulations prohibit the use of snowplanes in [GTNP] after the winter season of 2001-2002. Those provisions are not addressed in, nor affected by, the supplemental EIS process and therefore it is appropriate they take affect as they appear in the existing regulations. No

public comment is being solicited on these provisions." (*A.R.* 81624.) NPS published

the Final Delay Rule on November 18, 2002, generally deferring for one year the phase

out of snowmobiles under the 2001 Rule.  67 FED. REG. 69473 (Nov. 8, 2002).  The

2002 Delay Rule explained,

> Over 1,200 other letters were received supporting the continued
> use of snowplanes on Jackson Lake.  The NPS specifically indicated in
> the proposed rule that snowplane use would not be reconsidered since it
> was not an element of the SEIS.  The use of snowplanes on Jackson
> Lake continues to be prohibited.

*Id.* at 69476 (*A.R.* 81818.)

On February 20, 2003, the NPS issued the Final SEIS wherein it restated its

position that the scope of analysis for the SEIS is limited to consideration of new

snowmobile technology, the effects of snowplanes having been adequately

documented in the FEIS.  "NPS has no need to revisit all the issues addressed in the

FEIS, including snowplanes." (*A.R.* 76514 at 422.)  Based on the new analysis, NPS

determined that snowmobile use could be authorized in the Parks without impairing

park resources through a combination of daily entry limitations, a requirement that most

snowmobile users have a guide, and a requirement that snowmobiles entering the

Parks meet strict best available technology air and sound emission requirements ("BAT

requirements"), including that they operate at or below 73 decibels.[5]  The 2003 ROD

once more reaffirmed the finding that snowplane use impairs park resources, and the

---

[5] The record indicates that 73 decibels is less than half as loud as 86 decibels.

2003 Rule therefore carried forward the decision to prohibit snowplanes on Jackson Lake. 68 FED. REG. 69268 (December 11, 2003).

The 2003 ROD was challenged in two separate lawsuits in D.C. District Court. *Fund for Animals v. Norton*, Civ. No. 02-2367 (D.D.C.); *Greater Yellowstone Coalition v. Norton*, Civ. No. 03-0752 (D.D.C.). All the parties to the 2001 Settlement Agreement, including the State of Wyoming, intervened on behalf of the NPS in the D.C. court to defend the 2003 ROD and FSEIS. Despite the fact that two different lawsuits were filed challenging the 2003 Rule, no party, particularly not Plaintiff, challenged any aspect of the decision to prohibit snowplane use or its underlying analysis.

On December 16, 2003, the D.C. court vacated and remanded the 2003 ROD, the 2003 SEIS, and the 2003 Rule finding that the decision to allow snowmobiles in the Parks violated NEPA and the APA. *Fund for Animals v. Norton*, 294 F.Supp.2d 92 (D.D.C. 2003). The order effectively reinstated the 2001 Rule.

That reinstatement ultimately led ISMA and the State of Wyoming to move the Wyoming District Court to reopen the lawsuit challenging the 2001 Rule. On February 10, 2004, that court temporarily enjoined NPS from enforcing the 2001 Rule, finding that the 2001 Rule was leading to irreparable economic harm, and ordered NPS to implement "fair" rules for the remainder of that winter season. *Int'l Snowmobile Mfrs. Ass'n v. Norton*, 304 F.Supp.2d 1278, 1294 (D. Wyo. 2004) ("*ISMA I*"). In compliance with this order, on February 11, 2004, the NPS issued "Compendium Amendments" to

provide emergency snowmobile rules for the Parks. Again, the Compendium Amendments carried forward the prohibition of snowplanes on Jackson Lake. (*A.R.* 106206.)

On October 14, 2004, the Wyoming District Court vacated the 2001 Rule and remanded winter use plans to NPS. *Int'l Snowmobile Mfrs. Ass'n v. Norton*, 340 F.Supp.2d 1249 (D. Wyo. 2004) (*"ISMA II"*). The court found: that the NPS had failed to take a hard look at the environmental impact of the revised Alternative G; that the decision to ban snowmobiles in the Parks was a "prejudged political decision;" the NPS failed its obligation to cooperating agencies; and the 2000 FEIS, 2000 ROD and 2001 Rule were promulgated in violation of NEPA and the APA. The decision to prohibit snowplane use was never raised by any party in either *ISMA I* or *ISMA II*, and Plaintiff did not participate in the lawsuit. The snowplane prohibition was not an issue in that case, and the decision did not address the finding that snowplane use impairs park resources or otherwise suggest the snowplane analysis in the FEIS was deficient.

Subsequent to the issuance of *ISMA I*, NPS initiated the 2004 Temporary Winter Use Plan Environmental Assessment ("EA") in an effort to provide some degree of certainty to the public about winter use management in the Parks. (*A.R.* 104565.) NPS accepted comments during the public scoping period from June 14 through July 13, 2004. (*A.R.* 95906.) Of the 15,083 documents commenting on the scope of the EA, none were from Plaintiff and no one else provided factual information refuting the

validity of the NPS's analysis of the impacts of snowplanes or suggesting that NPS's finding of impairment from snowplanes was erroneous. The NPS stated, "This EA will not re-evaluate decisions about the management of winter recreational use that have already been implemented, including the prohibition of snowplanes on Jackson Lake (which were found to impair park resources and values) . . . ." The EA explained, "These decisions were supported by the analysis in the 2000 EIS, which remains relevant and is incorporated by reference. The analysis done in the 2000 EIS indicated that snowplane use on Jackson Lake results in impairment of park resources and values" and "[t]he NPS has no reason to doubt the validity of that analysis." (*A.R.* 95906.)

On August 20, 2004, the EA and draft Finding of No Significant Impact ("FONSI") were released for public comments, which were accepted through September 20, 2004. NPS then accepted comments on the proposed regulation, which was published in the Federal Register on September 7, 2004, until October 7, 2004. (*A.R.* 97340.) The NPS's preferred alternative allowed access to the frozen surface of Jackson Lake via snowmobile for purposes of fishing. The Proposed Rule stated:

> Based on the analysis set forth in the 2000 EIS and ROD, as reaffirmed in the EA, NPS has found and continues to believe that the use of snowplanes would impair park resources. As a result, and to avoid uncertainty based on the previous use on Jackson Lake, this proposed rule includes language that specifically prohibits the operation of snowplanes in each of these parks.

-14-

(*A.R.* 97347.) On September 14, 2004, Plaintiff submitted its first comment to the NPS

in support of continued snowplane use on Jackson Lake, asserting legal arguments the

same as those set forth in this lawsuit. (*A.R.* 105008-014.) Notably, Plaintiff still failed

to present any factual evidence to support its argument that the scientific data relating

to snowplanes upon which the NPS relied in eliminating their use was outdated and

inaccurate.

On November 4, 2004, NPS signed and publicized a Final FONSI on the EA.

(*A.R.* 99700, 99698.) NPS once more re-adopted the finding from 2000 that use of

snowplanes on Jackson Lake resulted in impairment of the natural soundscapes in

Grant Teton and continued the decision to prohibit the use of snowplanes on Jackson

Lake.

> The EA did not re-evaluate the issue of whether the use of snowplanes
> should be allowed on Jackson Lake . . . . The decision to prohibit
> snowplanes was based on analysis provided in the 2000 Winter Use
> Plans Final Environmental Impact Statement and subsequently
> incorporated into the 2003 Final Supplemental Environmental Impact
> Statement analysis, which found that snowplane use impaired park
> resources and values. Although both of these documents have been
> vacated by the courts on procedural grounds, the NPS maintains that the
> underlying analysis in them regarding the impacts of snowplanes is valid,
> and adopts anew their conclusion here. Therefore, since the use of
> snowplanes was discontinued following the 2001-2002 winter season, the
> NPS did not separately consider the reinstatement of their use in the EA
> or this [FONSI] (this issue was also not a subject of the decision in either
> the D.C. or Wyoming district courts).

(*A.R.* 99708.)

-15-

Implementing regulations that continued the prohibition of snowplane use were published in the Federal Register on November 10, 2004 ("2004 Rule"). 69 FED. REG. 65348.

The 2004 Rule provides a framework for managing winter visitation and recreational use in the Parks through the winter of 2006-07, while NPS completes a long-term plan for managing winter use.[6] (A.R. 96958.) On November 4, 2004, the Fund for Animals filed a challenge to the 2004 FONSI in the D.C. District Court. *Fund for Animals v. Norton*, 04-1913 (D.D.C.) ("2004 D.C. action"). On November 10, 2004, the Wyoming Lodging and Restaurant Association and subsequently the State of Wyoming filed a challenge to the 2004 Rule in Wyoming District Court. *Wyoming Lodging and Restaurant Ass'n v. Norton*, Civ. No. 04-315 ("2004 Wyoming action"). On March 29, 2005, Plaintiff filed this action.

Subsequently on October 14, 2005, the district court in the 2004 Wyoming action denied the plaintiffs' petition for review and held that the 2004 Rule and its EA/FONSI comply with NEPA and the APA. *Wyoming Lodging and Restaurant Ass'n v. Norton*, 398 F.Supp.2d 1197 (D. Wyo. 2005). Among other things, the Wyoming District Judge held that the EA analyzed a reasonable range of alternatives and that the decision to require commercial guides in Yellowstone was within NPS's discretion and supported

_____

[6] On June 24, 2005, NPS announced its intention to prepare a comprehensive management plan for winter recreational use of the Parks. 70 FED. REG. 36656-01.

by reasoned analysis. *Id.* at 1215-16.[7]

Additionally, section 146 of the Consolidated Appropriation Act, 2005, Pub. L. No. 108-447, 118 Stat. 2809, 3074 (2004), mandated that the 2004 Rule be in force and effect for the 2004-2005 winter season, which commenced on December 15, 2004. Similarly, section 126 of the fiscal year 2006 Appropriations Act again mandated that the 2004 Rule would be in force and effect for the 2005-2006 winter season. Department of the Interior, Environment, and Related Agencies Appropriations Act, 2006, Pub. L. No. 109-54, 119 Stat. 499, 525 (2005) ("Notwithstanding any other provision of law, the National Park Service final winter use rules published in Part VII of the Federal Register for November 10, 2004, 69 FED. REG. 65348 et seq., shall be in force and effect for the winter use season of 2005-2006 that commences on or about December 15, 2005."). Most recently, Congress again mandated that the 2004 Rule remain in effect for the 2006-2007 winter use season. Continuing Appropriations–FY 2007, Pub. L. No. 109-383, § 135, 120 Stat. 2678, 2679 (2006); Revised Continuing Appropriations Resolution, 2007, Pub. L. No. 110-5, § 20516, 121 Stat. 8, 27 (2007).

---

[7] On March 15, 2006, the D.C. District Court issued an order denying the parties' cross motions for summary judgment in the 2004 D.C. action. The District Judge explained that, in view of the fact that Congress has enacted appropriations bills in consecutive years with riders directing the NPS to implement the 2004 Rule for winter seasons, the possibility of a third consecutive year wherein such rider may again be included in the appropriations bill, and in an effort to conserve precious judicial resources, the motions should be denied without prejudice to reconsideration. The plaintiffs' motion for further proceedings and second motion for summary judgment are now pending before that court.

## STANDARD OF REVIEW

Judicial review of an agency's final action is governed by the Administrative Procedure Act ("APA"). *See* 5 U.S.C. §§ 701 to 706; *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Fuel Safe Washington v. F.E.R.C.*, 389 F.3d 1313, 1322-23 (10th Cir.2004). This standard applies not only to claims asserting a violation of the APA, but also to those asserting NEPA violations. *See Fuel Safe Washington*, 389 F.3d at 1322-23. Under the APA, a federal court may set aside agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). An agency decision is arbitrary or capricious if: (1) the agency entirely failed to consider an important aspect of the issue; (2) the agency offered an explanation for its decision that was counter to the evidence before it; (3) the agency relied on factors that Congress did not intend for it to consider; or (4) the agency's decision is so implausible that it could not be ascribed to the product of agency expertise. *Colo. Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir.1999).

In applying this deferential standard of review, a federal court is required to review the whole administrative record, or those parts of the record cited by the parties. *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1164 (10th Cir.2002). The court reviews the administrative record to ensure the agency's decision was based on consideration of the relevant factors and was not the result of a clear error in judgment. *Colo. Envtl. Coalition*, 185 F.3d at 1167. In so reviewing, the court cannot substitute its judgment for that of the agency. *Utahns for Better Transp.*, 305 F.3d at 1164.

The essential function of judicial review under the APA is for the federal court to determine whether the agency: (1) acted within its scope of authority; (2) complied with prescribed procedures; and (3) acted in accordance with law (i.e., did not act arbitrarily or capriciously). *Olenhouse*, 42 F.3d at 1574. As part of this review, a court must also ensure that the agency action is supported by substantial evidence in the record. *Id.* In the end, administrative decisions may only be set aside for substantial procedural or substantive reasons. *Utahns for Better Transp.*, 305 F.3d at 1164. However, courts and agencies alike should be mindful that an "agency's rule-making power is not the power to make law, it is

-18-

only the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." *Sundance Assocs. v. Reno*, 139 F.3d 804, 808 (10th Cir.1998) (internal quotations and citations omitted).

*Wyoming Lodging and Rest. Ass'n (WLRA)*, 398 F.Supp.2d at 1207-08.

### DISCUSSION

In the present action, Plaintiff alleges that the NPS failed to supply a reasoned analysis for the elimination of snowplanes from GTNP after sixty-five years of historic use, that the NPS deprived the public of meaningful participation in the decision to eliminate snowplane use from GTNP, and that the NPS failed to consider reasonable and appropriate alternatives to the total elimination of snowplane use from GTNP.

As an initial matter, Plaintiff's arguments are premised on the erroneous assertion that NPS has unlawfully continued to enforce the 2001 Rule despite its vacatur by the Wyoming Court in *ISMA II*. However, the 2001 Rule and its rule-making process have been superseded by three subsequent rule-making processes and a Compendium Amendment, all of which re-adopted the prohibition on snowplane use on Jackson Lake. Snowplanes are presently prohibited pursuant to the 2004 Rule, not the 2001 Rule.

This fundamental misunderstanding plagues Plaintiff's entire brief, which never really addresses the 2004 Rule and the process that led to it. Plaintiff apparently believes that because the 2004 NEPA and rule-making process re-adopted the underlying factual analysis form 2000 in reaffirming the finding that snowplane use

-19-

impairs park resources, that NPS has somehow continued to administer the vacated

2001 Rule. The Court agrees with Defendants, however, that Plaintiff is mistaken on

this point. During the three and a half years between the 2001 Rule and the 2004 EA –

and three intervening regulations – no one ever legally challenged the validity of the

snowplane prohibition. Moreover, no one ever provided any convincing evidence or

information to suggest that NPS's analysis regarding snowplanes was flawed, or gave

NPS any reason to doubt the validity of its prior analysis. Nor did anyone provide

convincing new information regarding snowplane technology. The EA therefore re-

adopted the prior analysis regarding snowplanes, and NPS again determined that their

use impairs park resources. As a result, NPS again prohibited snowplanes in its 2004

Rule.

Although two federal courts found procedural defects in the NPS's two previous

NEPA and rule-making processes on winter use plans, the analysis and supporting data

with respect to snowplanes were never challenged or found to be lacking. Federal

regulations instruct agencies to incorporate material into NEPA documents by reference

when the effect will be to cut down on bulk and avoid undue length without impeding

agency or public review of the action. 40 C.F.R. § 1502.21; 46 FED. REG. 18026, 18037

(Mar. 23, 1981) (Counsel on Environmental Quality's 40 most asked questions).

Incorporation by reference is generally permitted so long as the incorporated material is

reasonably available, the statement is understandable without undue cross-reference,

and the incorporation by reference meets a general standard of reasonableness. *See id.*; *Baltimore Gas and Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 100 n.12 (1983). The Court finds that incorporation by reference in the EA here was appropriate under the circumstances.

The 2004 EA and FONSI served as the NEPA compliance supporting the 2004 Rule, including its continuation of the prohibition on the use of snowplanes on Jackson Lake. For purposes of establishing jurisdiction under the APA, the 2004 Rule is a distinct "final agency action" from the 2001 Rule. As the D.C. District Court explained, "The 2004 Decision is a new 'final agency action' resulting from an entirely new rule making process; it imposes different substantive requirements, involves a different scope, and is based upon a different administrative record, including a new Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") . . . ." *The Fund for Animals v. Norton*, 390 F.Supp.2d 12, 15 (D.D.C. 2005). Consequently, the D.C. District Court rejected the plaintiffs' attempts to have the court enforce its 2003 Order relating to the NPS's 2003 Final Rule, finding that "the proper avenue for plaintiffs' arguments is a new lawsuit squarely challenging the validity of the 2004 Decision." *Id.* This Court agrees. Therefore, the litany of procedural defects that Plaintiff cites from the 2001 rule-making process is irrelevant to the validity of the 2004 Rule and the present snowplane prohibition.

Finally, because NPS took affirmative steps to fill the regulatory void left after the

Wyoming Court vacated the 2001 Rule, the 1983 Rule that previously authorized

snowplane use on Jackson Lake should not be restored as Plaintiff suggests. The

cases that Plaintiff relies upon to support this argument do not dictate otherwise.

Rather, those cases simply provide that when regulations are vacated, the agency must

revisit the problems identified by the court. *See Envtl. Def. v. Leavitt*, 329 F.Supp.2d

55, 64 (D.D.C. 2004); *Harmon v. Thornburgh*, 878 F.2d 484, 494-95 (D.C. Cir. 1989).

Here, the NPS promulgated the 2004 Rule to begin to address the NEPA and APA

concerns identified by the two federal district courts. However, because the snowplane

analysis was never challenged or found to be invalid, the agency was entitled to

incorporate that analysis by reference into its 2004 process. Contrary to Plaintiff's

insistence, NPS is not continuing to enforce an invalid regulation against snowplanes.

Rather, the snowplane use in GTNP is prohibited pursuant to the 2004 Rule.

## A. Reasoned Analysis

Plaintiff asserts that NPS failed to supply a reasoned analysis for the elimination

of snowplanes from GTNP. Plaintiff's argument is premised on the long-standing

practice of allowing snowplane use on Jackson Lake. The Tenth Circuit recognizes that

the court "must apply added requirements when there has been a significant departure

from long-standing policy." *Humana of Aurora, Inc. v. Heckler*, 753 F.2d 1579, 1582

(10th Cir. 1985) (citing *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto.

Ins. Co.*, 463 U.S. 29 (1983)). "The agency must clearly articulate the basis for the

-22-

change. This is not only an aspect of any procedural notice requirement in rule-making but is a substantive need." *Id.* (internal quotations and citation omitted). "Accordingly, an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42.

Despite the past history of such use, however, the 2000 winter use analysis was the first time NPS studied in detail the effects snowplanes have on park resources and values. Plaintiff points out that the DEIS, by virtue of choosing a preferred alternative that provided for continued snowplane access, concluded that continued snowplane access would not permanently impair park resources and was otherwise in accordance with law. In stark contrast, however, the FEIS reversed its position and adopted a preferred alternative banning snowplane access in its entirety. Plaintiff argues that the FEIS provided no explanation or discernable justification for the change, and NPS did not affirmatively justify the change based on the limited additional studies revealed between the Draft and the Final EIS.

The 2000 FEIS analysis provided information on the acreage of park land affected by the sound of oversnow vehicles on various road segments in the Parks, including snowplane use on Jackson Lake. Even if restricted to 86 decibels, the analysis revealed that snowplane use was one of the largest contributors to the total park acreage impacted by oversnow vehicle noise. This was so despite the small

number of snowplanes in comparison to the amount of snowmobile use in the Parks. Thus, a very small number of snowplane users resulted in an extraordinarily disproportionate impact on the natural soundscape of GTNP.

The 2000 ROD explained, "Under the NPS Organic Act, the NPS may not allow the impairment of park resources and values, and when there is an impairment, the NPS must eliminate it." (A.R. 91427.) The NPS found that snowplane use, "though limited to Jackson Lake, has a dominant and unmitigated impact on the natural soundscape." (A.R. 91424.) Accordingly, the NPS prohibited snowplane use in its 2001 Rule.

In its 2004 Final Rule, the NPS explained that it "continues to believe that the data and analysis in previous environmental analyses remain valid and concluded in the FONSI that the use of snowplanes on Jackson Lake would result in impairment of the natural soundscape." (A.R. 96965.) The 2004 Rule also noted, "In addition, with their unguarded propellers and high travel speeds, snowplanes present unacceptable safety risks, even on the surface of Jackson Lake." Id. The NPS further explained that it "is not aware of any new or additional information regarding snowplanes that would suggest any different conclusion." Id. The NPS thus concluded that "the NPS would be in violation of the NPS Organic Act if it were to allow the recreational use of snowplanes on Jackson Lake." Id.

Courts afford "considerable weight" to the agency's regulations and its

-24-

construction of the statutory scheme it administers. *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 844 (1984). The NPS has broad statutory authority under the NPS Organic Act and other statutes to manage and regulate activities in areas of the National Park System including GTNP.[8]  The NPS Organic Act instructs NPS to "conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. This provision gives the NPS broad discretion in "weighing the competing uses" in the management of national parks. *See Organized Fishermen of Fla. v. Hodel*, 775 F.2d 1544, 1550 (11th Cir. 1985).[9]

Plaintiff seeks to alter the degree of deference afforded to the NPS under the APA and Organic Act by alleging that snowplane use on Jackson Lake represents a "settled course of behavior," and that NPS's decision to prohibit them represents a "radical departure" for which "NPS can not be afforded any deference." However, the Organic Act prohibits impairment of park resources, regardless of past history. As set forth above, NPS supplied a reasoned analysis for its determination that snowplane use on Jackson Lake impairs park resources. Because this determination falls squarely

---

[8] *See, e.g.,* 16 U.S.C. § 3 ("The Secretary of the Interior shall make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks, monuments, and reservations under the jurisdiction of the National Park Service . . . .").

[9] *See also* cases cited in Defs. Resp. Br. at 25 n.14.

within NPS's expertise and statutory discretion, NPS's decision to prohibit snowplanes
is entitled to deference by the Court.

Further, even accepting Plaintiff's characterization that the snowplane prohibition
is a "radical departure" from past practice, NPS's decision in this regard would still be
entitled to deference.  The Supreme Court, the Tenth Circuit and the Wyoming District
Court have all made clear that "[a]n agency is free to change the meaning it attaches to
ambiguous statutory language, and the new interpretation may still be accorded
Chevron deference."  Southern Utah Wilderness Alliance v. Dabney, 222 F.3d 819, 828
(10th Cir. 2000).  See also Nat'l Cable & Telecomm. Ass'n v. Brand X Internet, 545 U.S.
967, 981-82 (2005); WLRA, 398 F.Supp.2d at 1220.  For example, in Nat'l Cable &
Telecomm., plaintiffs alleged Chevron deference was inappropriate because the
agency's interpretation of the Communications Act was inconsistent with its past
practice.  The Supreme Court explicitly rejected this argument and stated, "Agency
inconsistency is not a basis for declining to analyze the agency's interpretation under
the Chevron framework."  545 U.S. at 981.  The Court further explained,

> For if the agency adequately explains the reasons for a reversal of policy,
> change is not invalidating, since the whole point of Chevron is to leave the
> discretion provided by the ambiguities of a statute with the implementing
> agency.  An initial agency interpretation is not instantly carved in stone.
> On the contrary, the agency . . . must consider varying interpretations and
> the wisdom of its policy on a continuing basis, . . . for example, in
> response to changed factual circumstances, or a change in
> administrations[.]

*Id.* (internal quotations and citations omitted). Thus, even if the NPS's past allowance of snowplanes could have somehow been viewed as a prior "interpretation" of the Organic Act (despite the lack of any analysis of the issue), NPS was clearly entitled to change that interpretation based on the 2000 analysis, and that decision is entitled to deference. The Court agrees with the government that the mere fact an activity had historically been permitted does not somehow mean that NPS could ignore its impairment findings or that a lesser standard of protection should be afforded.

Plaintiff's efforts to undermine NPS's impairment finding must similarly fail. First, Plaintiff suggests that the impairment finding cannot be sustained because it was the result of a "prejudged, political decision." Second, Plaintiff suggests evidence in the record supports a contrary finding. Contrary to Plaintiff's first assertion, the prohibition on snowplane use has been the product of two successive administrations – the original decision to prohibit snowplanes in 2000 was made while the Clinton administration held office, and it has been subsequently reaffirmed multiple times under the Bush Administration. Furthermore, Congress has twice provided specific direction to the NPS requiring that the 2004 Rule, including the prohibition of snowplanes on Jackson Lake, remain in effect.

Second, Plaintiff suggests that evidence in the record supports a finding that snowplane use has "a negligible adverse impact" on park resources. In support of this argument, Plaintiff cites evidence in the record that snowcoaches could be heard at

-27-

greater distances than snowplanes. (*A.R.* 28623.) On this point, the NPS explained,

> Because the distances to audibility limits are based on the unique frequency characteristics of the sound sources, the background environments and the human auditory system, comparisons of the A-weighted sound levels alone will not lead to an understanding of the differences. For example, the Bombardier snowcoach can be heard at greater distances than the snowplane, which exhibits significantly higher A-weighted sound levels. Most of the sound energy from the snowplane at 50 feet is in the mid- and high frequencies, which become significantly reduced over long distances, whereas most of the sound energy from the Bombardier snowcoach is in the lower frequencies, which are much less attenuated by distance.

*Id.* In explaining the effects of preferred alternative G on the natural soundscape, the

FEIS states,

> Compared to the no action alternative, there are increases in acreage for the "audible at all" categories for all of the YNP road segments using snowcoaches only due to the long distances to audibility for the Bombardier Snowcoaches as discussed under the *Effects Common to All Alternatives* section of this chapter. . . . However, these increases are more than compensated for by the elimination of oversnow vehicles on Jackson Lake and Teton Park Road, leading to the overall reduction in acreage.

(*A.R.* 28824-25.)

Plaintiff also argues that the DEIS concluded that continued snowplane use on

Jackson Lake was legally acceptable, despite "negligible adverse impacts" and that the

beneficial improvements from the elimination of snowplane use would be "minor." (Pl.

Br. at 38-39.) First, Plaintiff supports its argument by cherry-picking a few impact topics

for which snowplanes may have had a negligible impact, such as water quality.

-28-

However, NPS's finding of impairment from snowplane use had nothing to do with water

quality; rather, it was based on impacts from noise. Moreover, the DEIS did not

"conclude" anything; rather, it simply analyzed impacts. Plaintiff infers that the

presence of continued snowplane use in the DEIS preferred alternative constituted a

conclusion. Even if such an inference were reasonable, it cannot be considered

binding. Otherwise, what purpose would exist for the requirement of accepting and

considering public comment on the DEIS.

Nevertheless, even if evidence exists in the record that supports a contrary

finding, the NPS is permitted to choose between conflicting evidence in rendering its

decision. *WLRA*, 398 F.Supp.2d at 1220.

> [T]he mere fact that there is evidence in the record contradicting the
> NPS's final conclusion does not prevent it from being supported by
> substantial evidence. *See Consolo v. Federal Maritime Comm'n*, 383 U.S.
> 607, 620 (1966) ("[T]he possibility of drawing two inconsistent conclusions
> from the evidence does not prevent an administrative agency's finding
> from being supported by substantial evidence."); *Wyoming Farm Bureau
> Federation v. Babbitt*, 199 F.3d 1224, 1241 (10th Cir. 2000) ("[T]he mere
> presence of contradictory evidence does not invalidate the Agencies'
> actions or decisions.") A reviewing court "cannot displace the [agency's]
> choice between two conflicting views, even if [it] would have made a
> different choice had the matter been before [it] de novo." *Custer County
> Action Ass'n [v. Garvey*, 256 F.3d 1024, 1036 (10th Cir. 2001)].

*Id.* at 1218. "NPS is the expert in this area and, consequently, is entitled to a great

amount of deference when making such decisions." *Id.* at 1220. Here, NPS

reasonably concluded that snowplanes operating at 86 decibels, more than twice as

loud as the current BAT requirements for snowmobiles, cause excessive noise in violation of park standards.

For all these reasons, Plaintiff's allegation that NPS failed to provide a sufficient explanation for its decision to prohibit snowplanes is without merit. NPS's decision to prohibit snowplane use falls within the broad discretion of the NPS as the federal agency entrusted by Congress with responsibility to properly manage and protect our national parks. The Court concludes that NPS's finding that snowplane use on Jackson Lake has a dominant and unmitigated impact on the natural soundscape is supported by a reasoned analysis.

## B. Public Participation

NEPA requires federal agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a). NEPA further directs federal agencies to provide "public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected." 40 C.F.R. § 1506.6(b). Plaintiff contends that the NPS deprived the public of the opportunity to meaningfully participate in the decision to eliminate snowplane use from Jackson Lake. Defendants insist that Plaintiff had ample opportunity to present NPS with its contentions, and any supporting evidence, that snowplane use could continue without impairing park resources.

With respect to NPS's compliance with NEPA procedures in the 2000 FEIS and ROD process, the Wyoming District Judge stated, "The Court has no doubt that through the preparation of the DEIS the NPS followed NEPA procedures, working with the cooperating agencies and giving the public ample opportunity to respond to the DEIS." *ISMA I*, 340 F.Supp.2d at 1263.  Nevertheless, Plaintiff failed to submit a single comment during that process.

Plaintiff suggests that its failure to comment is due to the fact that neither the EIS scoping notice nor any *Federal Register* notice published prior to December 18, 2000, referenced snowplanes specifically, or distinguished snowplanes from snowmobiles. However, the scoping brochure clearly indicated that "winter use" plans for the Parks were being evaluated and that resource damage caused by noise was one of the existing concerns.  (*A.R.* 13199-13203.)  The scoping notice referred to "winter use" generally and did not limit the scope to any particular winter use activity – snowplanes are undoubtedly a winter use in GTNP.  Because the scoping notice applied to all winter use and nothing in it suggested that snowplane use would not be evaluated in the NEPA process, Plaintiff cannot claim it was unfairly denied notice.

Moreover, any confusion Plaintiff may have had about NPS's intentions would have been resolved by the subsequent DEIS.  The DEIS was released on September 29, 1999, and public comment was taken through December 15, 1999.  The DEIS included seven alternatives, two of which eliminated the use of snowplanes on Jackson

Lake.  Thus, the DEIS made clear that snowplane use on Jackson Lake was at issue, and that the planning process would determine whether the use of snowplanes on Jackson Lake would continue or be eliminated.  Even if the scoping process did not specifically mention snowplanes, their inclusion in the DEIS alternatives and analysis clearly alerted any interested parties to participate in the process.

Similarly, Plaintiff's assertion that its members were somehow entitled to special notice as permit holders, and were precluded from participating because they did not receive such notice, lacks merit.  Plaintiff provides no authority to support its position that it is entitled to special treatment.  Instead, it relies upon a conclusory allegation that because so few timely comments were received in support of snowplane use, it must mean that the users were not adequately informed.  Such an argument cannot be sustained.

Regardless of the fact that the Wyoming District Court in *ISMA II* ultimately determined that the NPS violated both NEPA and the APA in promulgating the 2001 Rule,[10] there have been two other NEPA processes since 2001, which included seven additional public comment periods.  As stated previously, the current prohibition on the use of snowplanes in GTNP is a creature of the most recent NEPA process (the Temporary Winter Use Plans EA) and 2004 Rule.  Plaintiff has focused its argument

---

[10] "[T]he facts evidence mere *pro forma* compliance with NEPA's procedures and requirements starting in January 2000, when the NPS made the prejudged political decision to ban snowmobiles in the Parks."  *ISMA II*, 340 F.Supp.2d at 1263.

entirely on the 2000 NEPA process and has not challenged the notice and opportunity for public participation subsequent thereto.

The Court finds that the NPS conducted its NEPA and rule-making process for the 2004 Rule in a timely manner with significant involvement by the interested public and state and federal agencies. NPS invited public comment three times during this administrative process. First, NPS accepted comments during the public scoping period, from June 16 through July 13, 2004. (A.R. 104565.) Second, NPS accepted comments on the EA and draft FONSI from August 20 through September 20, 2004. (A.R. 95890.) Finally, NPS accepted comments on the proposed regulation, from its publication in the *Federal Register* on September 7, 2004, until October 7, 2004. (A.R. 97340.) NPS accepted comments by mail and through the Internet. *Id.* Thus, Plaintiff cannot dispute that the 2004 Rule complies with public participation requirements. The Court finds that the public was not deprived of meaningful participation in the present decision to eliminate snowplane use from GTNP.

## C. Consideration of Alternatives

Plaintiff contends that the NPS failed to consider reasonable and appropriate alternatives to the total elimination of snowplane use from GTNP. As an initial matter, Defendants argue that Plaintiff has forfeited its right to object to the alternative analysis by failing to raise its concerns to the agency in a timely manner.

In *WLRA*, the same federal defendants likewise argued that the plaintiffs should

-33-

not be able to challenge the agency regulation at issue (the 2004 EA) because they

failed to provide meaningful participation in the public processes by which such

regulation was promulgated. In determining the parameters of such a defense, the

Wyoming District Judge considered the following:

> In *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def.
> Council, Inc.*, 435 U.S. 519 (1978), the Supreme Court determined that a
> party wishing to challenge agency action must participate in the public
> process so that it alerts the agency of the party's positions and
> contentions and, therefore, allows "the agency to give the issue
> meaningful consideration." *Dep't of Transp. v. Public Citizen*, 541 U.S.
> 752 (2004); *Vermont Yankee*, 435 U.S. at 553-54. *See also Wilson v.
> Hodel*, 758 F.2d 1369, 1373 (10th Cir. 1985) ("[A] reviewing court will not
> consider contentions which were not pressed upon the administrative
> agency."). . . . The purpose of this rule is to ensure that reviewing courts
> do not substitute their "judgment for that of the agency on matters where
> the agency has not had an opportunity to make a factual record or apply
> its expertise." *New Mexico Envtl. Imp. Div. v. Thomas*, 789 F.2d 825, 835
> (10th Cir. 1986). Agency action should be "reviewed on the basis
> articulated by the agency, and on the evidence and proceedings before
> the agency at the time it acted." *Lewis v. Lujan*, 826 F.Supp. 1302, 1306
> (D. Wyo. 1992) (Johnson, J.) (citing *American Min. Congress v. Thomas*,
> 772 F.2d 617, 626 (10th Cir. 1985)). "Simple fairness to those who are
> engaged in the tasks of administration, and to litigants, requires as a
> general rule that courts should not topple over administrative decisions
> unless the administrative body not only has erred but erred against
> objection made at the time appropriate under its practice." *Wilson*, 758
> F.2d at 1372-73 (quoting *United States v. L.S. Tucker Truck Lines*, 344
> U.S. 33 (1952)).

*WLRA*, 398 F.Supp.2d at 1209. The undersigned District Judge agrees with the

reasoning of his colleague that the rule is not, however, intended to create a

jurisdictional prerequisite to bringing suit; rather, the rule is intended to provide the

-34-

agency with an opportunity to review information presented to it during the public process and make a decision based upon that information. "Thus, so long as the agency is informed of a particular position, any party may challenge the action based upon such position whether or not they actually submitted a comment asserting that position." *Id.* at 1210.

Here, Plaintiff had ample opportunity to present NPS with its contention, and any supporting evidence, that snowplane use could continue without impairing park resources. However, Plaintiff failed to do so. Certain counties and the State of Wyoming submitted general comments during the SEIS process protesting the NPS's refusal to reconsider its previous decision to eliminate snowplane use from Jackson Lake. But neither these comments nor anyone else ever suggested that NPS re-evaluate its findings or offered evidence that NPS's previous analysis was invalid. At most, these commentators expressed a general disagreement with NPS's decision to prohibit snowplanes, but they did not provide any substantive basis for NPS to re-evaluate its impairment finding. These comments do not meet the threshold requirement of materiality sufficient to raise concerns regarding the agency's lack of consideration. *See Vermont Yankee*, 435 U.S. at 553.

Again focusing on the 2000 FEIS, Plaintiff contends that the NPS erred in considering only two courses of action relevant to snowplane use on Jackson Lake: either allow snowplane use to continue, or totally eliminate snowplane use altogether.

Plaintiff argues that the NPS failed to identify or analyze other reasonable alternatives that would have authorized continued snowplane use on Jackson Lake. However, nothing in the record indicates that any substantive comments regarding the use of snowplanes on Jackson Lake were received during scoping, and nothing in the record indicates that the suggestion was ever made during the FEIS process that the use of snowplanes on Jackson Lake should be managed through further reduced numbers, limited hours of operation, speed limits or restricted travel time as now urged by Plaintiff. Plaintiff has not cited to any proposed alternatives urged upon the NPS beyond those evaluated in the FEIS. Consequently, Plaintiff has forfeited any objection to the FEIS on the ground that the NPS failed to consider potential alternatives to the elimination of snowplane use from GTNP. *See Dept. of Transp.*, 541 U.S. at 764-65.

Further, this case does not present the situation where an EIS's flaws are so obvious in its alternatives analysis that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action. *Id.* at 765. NEPA requires "all agencies of the Federal Government [to] . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). The Tenth Circuit applies a "rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in a FEIS are merely flyspecks, or are significant enough to defeat the

goals of informed decisionmaking and informed public comment." *Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1163 (10th Cir. 2002). An agency is only required to consider "reasonable alternatives." *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir. 2002). The agency need only set forth alternatives sufficient to permit a reasoned choice. *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1039-40 (10th Cir. 2001).

In its 2000 FEIS, the NPS considered five alternatives that permitted the already limited number of snowplanes in use at Jackson Lake to continue, and two alternatives that prohibited snowplane use on Jackson Lake. No one, particularly not Plaintiff, suggested the NPS should consider other limited numbers, nor did anyone suggest NPS could require noise or safety requirements as now urged by Plaintiff. Finally, no one suggested that technological improvements to snowplanes should have been considered. In the absence of any evidence in the record to support the possibility of other reasonable alternatives, the Court cannot find that the FEIS is so flawed in its alternatives analysis that Plaintiff's ability to challenge the proposed action is preserved despite its failure to submit its contentions in a timely manner.

Finally, in light of the impairment finding and lack of evidence to the contrary, it would not have been appropriate for NPS to consider alternatives that permitted snowplanes in the 2004 EA. "Once an agency appropriately defines the objectives of an action, "NEPA does not require agencies to analyze the environmental

-37-

consequences of alternatives it has in good faith rejected as too remote, speculative or impractical or ineffective." *Citizens' Comm.*, 297 F.3d at 1030 (internal quotations and citations omitted).  Here, the NPS rationally determined that alternatives permitting snowplane use were not practical.  The purpose of the 2004 EA was to "consider alternatives that are not likely to have significant impacts to the human environment. . . . NPS lacks the discretion to authorize activities that would impair park resources or values." (*A.R.* 95905.)  The EA explained that based upon the previous analysis, snowplane use was "found to impair park resources and values," that the previous decision was "supported by the analysis in the 2000 EIS, which remains relevant and is incorporated by reference," that the NPS "has no reason to doubt the validity of that analysis," and, therefore, "[t]his EA will not re-evaluate" the prior decision.  (*A.R.* 95906.)  Accordingly, the NPS acted within its discretion to exclude alternatives to the snowplane prohibition from its consideration in the 2004 EA.

CONCLUSION

For the reasons set forth herein, the Court finds that the NPS supplied a reasoned analysis for the elimination of snowplanes from GTNP, the NPS provided the public with an opportunity for meaningful participation in the decision to eliminate snowplane use from GTNP, and the NPS adequately considered reasonable and appropriate alternatives to the elimination of snowplane use from GTNP.

**THEREFORE**, it is hereby

-38-

**ORDERED** that the relief requested in Plaintiff's Petition for Review of Agency Action is **DENIED**.

DATED this 27th day of June, 2007.

UNITED STATES DISTRICT JUDGE